**E-FILED on** __1/4/2011__

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SILICON LABS INTEGRATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> SHMUEL MELMAN, <br><br> Defendants. | No. CV 08-04030   RMW <br><br> ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT <br><br> **[Re Docket No.134]** |

Plaintiff Silicon Labs Integration, Inc. ("SLI") moves for summary judgment on defendant Shmuel Melman's ("Melman") counterclaim for breach of contract, quantum meruit, fraud, and negligent misrepresentation on the grounds that (1) there is no evidence that Melman entered into an enforceable contract with SLI (formerly Integration Associates, Inc. ("IA")) regarding payment of compensation for services rendered to IA in connection with Silicon Labs, Inc.'s ("Silicon Labs") acquisition of IA in July 2008; (2) that even if there was a contract, securities regulations required Melman to have a broker's license to perform the activities as issue, which he did not; and (3) Melman's activities do not fall within an exception to the broker's license requirement for individuals who make initial introductions. For the reasons stated below, the motion for summary judgment is

granted with respect to the breach of contract, fraud, and negligent misrepresentation claims.  It is denied with respect to the quantum meruit claim.

## I. BACKGROUND

SLI is a California corporation that designs and manufactures semiconductors for radio frequency, infrared, modem, and power management applications.  Before the events that form that basis for this suit, SLI was known as IA.  Melman is the Chief Executive Officer of Crow Electronic Engineering ("Crow") an Israeli corporation that manufactures electronic security systems, and which used IA's and Silicon Lab's semiconductor products in its security systems.

On August 7, 2007, the president of Silicon Labs contacted consultant Brad Fluke regarding a possible M&A transaction with one of three candidate companies, one of which was IA.  (Fluke Declaration, ¶ 3.)  By August 21, 2007, Silicon Labs had identified IA as a target company and decided to schedule a management presentation.  (Roy Declaration, ¶ 5.)  Fluke left several messages for IA's CEO between August 7, 2007 and August 24, 2007, and the two spoke for over an hour on August 24, 2007 about the compatibility of the companies.  (Fluke Declaration, ¶¶ 5-7.)  IA's CEO agreed to visit Silicon Labs at its headquarters in Austin, Texas to assess the possibility of a M&A transaction.  (*Id.*)

IA's CEO visited Silicon Labs on September 5, 2007, and the parties discussed the possibility of an M&A transaction in detail.  (*Id.*, at ¶ 9.)  On September 25, 2007, IA's CEO discussed the possibility of an acquisition with IA's board of directors, and the board voted to entertain the offer.  (*Id.*, at ¶ 12.)  Silicon Labs began reviewing IA's profits and loss statements and other detailed financial information. (Roy Declaration, ¶ 18.)  In November 2007, Silicon Labs gave a presentation about IA, stated that IA's expertise was aligned with Silicon Labs' core competency, and provided strategic reasons for the merger.  (*Id.*, at ¶ 8.)  On November 30, 2007, Silicon Labs and IA executed a nondisclosure agreement.  (*Id.*, at ¶ 13.)  On December 12, 2007, IA forwarded its financial information for Silicon Labs to use in evaluating IA's financial condition.  (*Id.*, at ¶ 18.)  On March 28, 2008, Silicon Labs circulated for internal review a letter of intent stating its intention to purchase IA.  (*Id.*, at ¶ 14.)  Silicon Labs sent the letter of intent to IA on April 9, 2008.  (*Id.*, at ¶ 15.)  IA executed the letter of intent on April 29, 2008.  Following the due diligence period, Silicon Labs and

1  IA executed an Agreement and Plan of Reorganization and announced that Silicon Labs would
2  acquire IA for $80 million on June 24, 2008. After the agreement closed, the two companies
3  became known as SLI.

4      This case is about whether a brokerage or finder's commission agreement existed between IA
5  and Melman. On February 28, 2008, Melman met with Rafael Fried, Vice President and General
6  Manager of IA's wireless division, to discuss IA's technology, including new generation short range
7  wireless technology. (Melman November 6, 2008 Declaration, ¶ 7-9). On March 6, 2008, Melman
8  spoke with Fried on the telephone and explained that he could find an appropriate acquirer or partner
9  for IA based on his understanding of wireless technology and his experience in the electronics
10 industry. (*Id.*, at ¶ 10). Melman explained that he "expected to be compensated for [his] efforts on
11 behalf of IA," and Fried agreed that he would be compensated. (*Id.*) Following the March 6, 2008
12 call, Melman invested considerable time and resource to study IA's technology and to identify a
13 suitable candidate to acquire or partner with IA. (*Id.*, at ¶ 14.) On March 11, 2008, Melman met
14 with Silicon Labs' Vice President of European Sales, Vaughan Price, and with Silicon Labs' Israeli
15 distributor, and Price described the company's new wireless chips. (*Id.*) Melman explained that in
16 his opinion, it would be a waste of time for Silicon Labs to develop wireless technology, and that
17 Silicon Labs should instead consider acquiring IA. (*Id.*) On April 9, 2008, Melman repeated those
18 statements to Price during a call arranged to solicit Melman's view on the Silicon Lab's plan to
19 develop short-range wireless chip products. (*Id.*, at ¶ 16.) Melman further communicated with
20 Fried, who "reaffirmed that IA would compensate [Melman] for his efforts" and who told Melman
21 that representatives from Silicon Labs had met with IA, praised Melman's expertise, and noted that
22 Melman recommended IA's technology. (Id. , at ¶ 16-17.)

23     After the acquisition closed, Melman contacted SLI regarding the commission to which he
24 contends he was entitled. It is undisputed that Fried and Melman never discussed the type or
25 amount of compensation that Melman would receive. Melman has claimed that at the time of the
26 transaction, there existed in Israel a trade custom and usage that in all contracts for the facilitation of
27 a strategic transaction, the service provider is entitled to a commission of at least 5% of the value of
28 the facilitated transaction. Because IA was acquired for $80 million, Melman contends that he is

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT—No. CV 08-04030 RMW
MEC        3

1 entitled to $4 million. Melman has provided no additional evidence in support of his statement that
2 the 5% fee "in Israel is and at all times mentioned has been certain and uniform, and of general
3 continuity and notoriety and acquiesced in by the industry." (Answer and Counterclaim to Amended
4 Complaint, ¶ 7.)

On August 19, 2008, Melman met with Kurt Hoof, Vice President of Worldwide Sales for Silicon Labs, without success regarding his claims. On August 22, 2008, SLI filed a complaint for declaratory relief and intentional interference with prospective economic advantage. Melman moved to dismiss the complaint on November 6, 2008, on the basis that the court lacked personal jurisdiction over Melman, that SLI's declaratory judgment claim involved a misuse of the Declaratory Judgment Act, that the doctrine of forum non conveniens precluded going forward in this court and required the case to be transferred to Israel, and that SLI's claim for intentional interference with prospective economic advantage failed to state a claim upon which relief could be granted. The court denied the motion to dismiss on all but the last grounds, and gave SLI leave to amend on the dismissed claim. SLI filed its amended complaint on July 29, 2009. Melman again brought a motion to dismiss, which was denied. On April 15, 2010, Melman filed an answer to the amended complaint, and added counterclaims for breach of oral contract, quantum meruit, fraud, and negligent misrepresentation. On November 24, 2010, SLI's counsel sent a letter to the court explaining that the parties had reached an agreement that SLI would dismiss its second claim for relief for intentional interference with prospective economic advantage under California law.

## II. ANALYSIS

Melman does not dispute SLI's contention that the court should apply California law to determine whether he entered into a valid contract with IA. Under California law, as elsewhere, every contract requires mutual assent or consent. *Weddington Production, Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998). "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." *Id.*, citing Cal. Civil Code §1580. In order for acceptance of an offer to result in the formation of a contract, the offer "must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain." *Id.*; *see also Ladas v. California State Automobile Association*, 19 Cal. App. 4th 761, 770 (1993).

In this case, even interpreting the evidence in the light most favorable to Melman, there is insufficient evidence that Melman and IA (through Fried) entered into a valid contract as a result of their telephone conversations in March 2008. To support contract validity, Melman now states "My agreement with IA, through its No. 2 executive Rafi Fried, was clear and definite: I was to identify potential strategic partners for a merger with or acquisition of IA in order to preserve and develop IA's newest wireless technology. Upon the completion of such a transaction, we agreed that I would be paid the fee that is customary in Israel for such transactions: five percent of the value of the transaction." (Melman November 27, 2010 Declaration, ¶ 4.) But these statements are belied by Melman's earlier and more detailed descriptions of his conversations with Fried and do not create a triable issue of fact. (See Melman November 6, 2008 Declaration, ¶ 7-9.) The mere fact that Fried stated that Melman would be "compensated" is simply too vague and uncertain to demonstrate that there was any agreement as to price. The conversation between Fried and Melman, as discussed by Melman's counsel at oral argument, in which Melman offhandedly mentioned to Fried that Melman "would do much better" if the deal was consummated than Fried would do as the result of a 2% interest in the company is also too vague, and the connection to the alleged enforceable contract term too attenuated, to provide adequate support for Melman's contention that there was an agreement about compensation. Further, there is no evidence in the record to support Melman's contention that Fried agreed to pay Melman 5% of the value of any eventual transaction or that such a fee is customary and usual in Israel.

To the contrary, the record clearly establishes that by March 2008, Silicon Labs and IA were at an advanced stage of merger discussions and had no need for Melman's assistance in introducing them or facilitating a merger, let alone that IA could possibly have intended to pay Melman $4 million for research into Silicon Labs or for suggesting to the salesmen for Silicon Labs with whom he conducted business that Silicon Labs should consider acquiring IA. At most, Melman may have believed that simply by conducting some basic research and complimenting IA's technology to Silicon Labs' Vice President of Sales, he would become entitled to a $4 million fee. No rational factfinder could find that IA could have intended those terms.

There is also no evidence to support Melman's claim of fraud or negligent misrepresentation. Melman fails even to allege that the statements made by Fried or anyone else were false when made, and his counsel conceded at oral argument that there is no evidence in the record that anyone had fraudulent intent at the time of the alleged misstatements.

Despite the fact that there was no valid, enforceable contract and that IA made no negligent or intentional misrepresentations, Melman's claim for recovery in quantum meruit for the value of the services he purportedly provided survives summary judgment. Quantum meruit alleges the performance of services for the defendant at the defendant's request. Under California law, one who confers benefits on another officiously, i.e., by unjustified interference in other's affairs, is not entitled to restitution. *See Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Ass'n*, 205 Cal. App. 3d 1415, 1422 (1988). However, the evidence in the record makes it plausible that some of Melman's efforts were made at IA's request, even if the parties did not reach an enforceable agreement as to Melman's compensation for those efforts. In California, "'[h]e who takes the benefit must bear the burden.'" *Bell v. Blue Cross of California*, 131 Cal. App. 4th 211, 221 (2005) (quoting Cal. Civ. Code §3521). While the court has doubts as to whether Melman conferred any measurable benefit on IA, those concerns must be resolved at trial. Further, it does not appear that performance of the services for which Melman seeks recovery required a broker's license.

### III. CONCLUSION

For the foregoing reasons, SLI's motion for summary judgment is granted with respect to the claims for breach of contract, fraud, and negligent misrepresentation. It is denied with respect to the claim for quantum meruit.

DATED:   1/4/2011

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge